UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

REDA MAZEN RIDA SABASSI,

Defendant.

---

INDICTMENT

26 Cr.

26 CRIM 290

**COUNT ONE**
**(Conspiracy to Provide Material Support to a Foreign Terrorist Organization)**

The Grand Jury charges:

**OVERVIEW**

1. Since at least in or about 2022, REDA MAZEN RIDA SABASSI, the defendant, has raised hundreds of thousands of dollars through online fundraising campaigns for Hamas, a designated Foreign Terrorist Organization ("FTO"), and for Hamas members and their families. SABASSI has used a purported charitable foundation that he controls, Ikram - The Arab Charity Foundation Inc. ("Ikram"), to solicit donations from individuals around the world, including from individuals in the Southern District of New York and elsewhere in the United States. SABASSI claimed that he was raising money to support humanitarian aid to people in Gaza and to orphans, but in reality, SABASSI used the money to support Hamas and diverted some of those funds for his own personal use.

**BACKGROUND ON HAMAS**

**Hamas's Founding, Structure, and Objectives**

2. "Harakat al-Muqawamah al-Islamiyya" is Arabic for "Islamic Resistance Movement" and is known by the acronym Hamas. Hamas, which is sometimes referred to by its

followers as "The Movement," is a terrorist organization based principally in the Gaza Strip and Palestinian West Bank territories.

3. Hamas was founded in 1987 by Sheikh Ahmed Yassin as an outgrowth of the Palestinian branch of the Muslim Brotherhood. The Muslim Brotherhood is an international Islamic organization founded in Egypt in 1928 and is committed to the globalization of Islam through social engineering and violent jihad. Hamas's founding occurred shortly after the December 1987 outbreak of violence in the first Palestinian intifada, or "uprising," throughout Israel, the Gaza Strip, and the West Bank.

4. In 1988, Hamas issued a charter, formally known in English as the "Covenant of the Islamic Resistance Movement," which identified Hamas as the Muslim Brotherhood in Palestine and stated that Hamas's purpose was to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

5. In 2017, Hamas issued a revised charter, entitled in English as "A Document of General Principles & Policies." The revised charter asserts that "Palestine," by which Hamas means the territorial area of Israel, the West Bank, and Gaza, "is a land that was seized by a racist, anti-human and colonial Zionist project that was founded on a false promise." The charter also codifies Hamas's commitment to violence, which Hamas calls "armed resistance," explaining that "resisting the occupation," *i.e.*, the State of Israel, "is a legitimate right guaranteed by divine laws and by international norms and laws," and that "[a]t the heart of these lies armed resistance[.]" Shortly after Hamas issued its revised charter, one of its leaders stated that "the new document will undermine neither our principles nor our strategy."

6. Hamas refers to its highest-ranking leadership body as its Political Bureau or "Politburo." The Politburo is responsible for setting policies and guidelines for Hamas's activities, including directing and coordinating terrorist acts.

7. Hamas carries out terrorist attacks and armed conflict through the Izz al-Din al-Qassam Brigades (the "al-Qassam Brigades"), its military wing. The al-Qassam Brigades conduct suicide bombings and other terrorist attacks within Israel, Gaza, and the West Bank, and have done so for decades. Hamas's campaign of terrorism has killed and wounded citizens of Israel, the United States, and many other countries.

8. On October 7, 2023, Hamas committed its most violent, large-scale terrorist attack to date (the "October 7 Hamas Massacres"). In the early morning hours of October 7, 2023, Hamas sent more than 2,000 armed fighters into farms and towns in southern Israel, where they carried out the massacres of over a thousand people and the kidnappings of more than 200 others. Hamas terrorists attacked civilians, firing handguns, assault rifles, and handheld rocket launchers, in small residential communities; an Israeli town; and a music festival; among other places.

9. Hamas raises money to fund its terrorist activities through a variety of methods, including by soliciting and receiving cryptocurrency payments, advertising the ostensible anonymity of such transactions. Since 2019, Hamas's military wing has used social media and other platforms to call for cryptocurrency contributions from supporters abroad, including in the United States, to Hamas-controlled virtual wallets, explicitly acknowledging that those payments would be used to fund Hamas's campaign of violence. In addition, Hamas has long abused the trust of the international community and public support for legitimate humanitarian causes to fund their terrorist activities and commit acts of violence by raising funds through nonprofit

organizations or charities. Hamas has entirely co-opted and run nonprofit organizations or charities while obscuring the links between these organizations and Hamas in order to evade sanctions. Moreover, Hamas has relied on purported "charitable" organizations and efforts, located around the world, to raise money, including through the "charitable" organizations' own social media accounts. Some of these "charitable" organizations are mere fronts for Hamas fundraising or serve a dual purpose in providing funding for Hamas and raising money for otherwise charitable pursuits. This allows Hamas to exploit the sympathy and generosity of the international public at the expense of the Palestinian people.

10. Hamas generates loyalty and support for the organization, its overall goals, and the operations of the al-Qassam Brigades through, among other means, a social wing. Hamas rewards terrorist acts, and provides incentives for perpetrating such acts, including by paying family members of Hamas operatives who are killed, injured, or imprisoned, and ensuring that the operatives' families are revered in the community.

**The Designation of Hamas as a Terrorist Organization Since 1997**

11. On October 8, 1997, the U.S. Secretary of State designated Hamas as an FTO under Section 219 of the Immigration and Nationality Act. The Secretary of State has also listed the following aliases for Hamas: Islamic Resistance Movement, Harakat al Muqawma al-Islamiya, Students of Ayyash, Students of the Engineer, Yahya Ayyash Units, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al-Qassim Forces, Izz Al-Din Al Qassim Battalions, Izz al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions. Hamas was one of the original FTOs designated as part of the Secretary of State's first exercise of authority under the Immigration and Nationality Act, and, to date, Hamas remains a designated FTO.

12. On October 31, 2001, the U.S. Secretary of State designated Hamas as a Specially Designated Global Terrorists ("SDGT") under Executive Order 13224.

**THE DEFENDANT**

13. REDA MAZEN RIDA SABASSI, the defendant, a naturalized U.S. citizen fluent in Arabic who resided in San Diego, California prior to his arrest, has raised funds for Hamas and helped others raise funds for Hamas.[1] Using Ikram, SABASSI has worked with a co-conspirator ("CC-1") to raise funds for purported charitable causes in Gaza. SABASSI directed some of those funds to CC-1, or, at CC-1's direction, to other recipients, to be used for Hamas. SABASSI also diverted other funds for his own personal use.

14. REDA MAZEN RIDA SABASSI, the defendant, has publicly supported Hamas online using his social media accounts to post Hamas propaganda and provide that material to others. For example:

a. On or about March 13, 2024, SABASSI posted to one of his social media accounts in English: "Al-Aqsa Flood: The complete footage of the October 7th attacks. Including promos, trailers and body-cam footage. Sourced from the official [social media] channel of Qassam Brigades the military wing of Hamas." "Operation Al-Aqsa Flood" was the name that Hamas gave to the October 7 Hamas Massacres. This post embedded an approximately one hour-long video of graphic violent acts, including murder, carried out by members of Hamas, consistent with the October 7 Hamas Massacres. SABASSI re-posted this original post on or about October

[1] Some of the information recounted herein is based on draft translations of statements in Arabic, which are subject to revision.

7, 2025 (*i.e.*, the two-year anniversary of the October 7 Hamas Massacres) with the caption: "The Raw Footage #ParamountPlus #Red Alert #October7th."

b. On or about January 14, 2026, SABASSI reposted a post from another user. That post contained an approximately 3-minute-long video, which, as explained in the post's caption, was generated using artificial intelligence and simulated the life of the former spokesperson for the al-Qassam Brigades Hudhayfa al-Kahlout.[2] The video glorified al-Kahlout's life as well as Hamas and al-Qassam Brigades fighters. The post also encouraged people to teach their children the biographies of these "great figures."

c. On or about March 29, 2026, SABASSI posted a screenshot of another social media post depicting former Hamas leader Yahya Sinwar[3] with a gun and the caption: "We won't discuss recognizing Israel, only wiping it out."

15. Electronic devices seized from REDA MAZEN RIDA SABASSI, the defendant, on or about March 26, 2024, also contained electronic evidence of SABASSI's support for Hamas. For example:

a. SABASSI possessed hundreds of photos, videos, and other media related to Hamas, including some materials that appear to have been sourced from the al-Qassam Brigades official Telegram channel and some material from and/or related to the October 7 Hamas Massacres.

---

[2] On or about April 12, 2024, OFAC designated Hudhayfa Samir 'Abdallah al-Kahlut, a/k/a "Abu Ubaida," who was the spokesman for the al-Qassam Brigades since at least 2007, pursuant to Executive Order 13224.

[3] On or about September 8, 2015, the Department of State designated Sinwar as an SDGT pursuant to Executive Order 13224.

b. SABASSI possessed an electronic document titled: "Our Narrative . . . Operation Al-Aqsa Flood," originally published by the Hamas Media Office. This document appears to be propaganda distributed by the Hamas Media Office following the October 7 Hamas Massacres. The first page of the document, shown below on the left, features the Hamas logo and the label "Hamas Media Office" and depicts two individuals standing on a tank, showing the border between Israel and Gaza with plumes of smoke rising in the background beyond the border. The last page of the document, shown below on the right, shows Hamas terrorists using motorized paragliders, which were used by Hamas during the October 7 Hamas Massacres to enter Israel.






16. On or about March 26, and 27, 2024, REDA MAZEN RIDA SABASSI, the defendant, participated in voluntary interviews with law enforcement. During these voluntary interviews, among other things, SABASSI told law enforcement the following, in substance and in part: he believed Hamas was fighting a bigger, more evil enemy—*i.e.*, the State of Israel; Hamas could help the citizens of Gaza; and Hamas has a noble cause, which is to get their land back.

SABASSI also claimed that he would not support Hamas with weapons or money because it is illegal.

**CC-1 AND GAZA NOW**

17. CC-1 manages and operates Gaza Now,[4] a Gaza-based organization that uses its social media and other online accounts to promote Hamas's terrorist agenda and solicit funds for Hamas. Gaza Now has used, and is currently using, various social media accounts to solicit funds, including in posts bearing Hamas propaganda, using cryptocurrency wallet identifiers to solicit cryptocurrency as well as fiat funds (government-issued currency) via links to its accounts on various remittance platforms.

18. Since at least in or about 2021, CC-1 has worked with another co-conspirator ("CC-2"), the director of Al-Qureshi Executives, an entity in the United Kingdom,[5] to raise funds and distribute propaganda for Palestinian Islamic Jihad ("PIJ"), a designated FTO.[6]

19. CC-1's brother ("CC-3") lives in Turkey. On or about December 19, 2023, CC-3 sent an audio message to CC-1, which CC-3 addressed to "Abu Al-Abed"—the commonly known alias for Ismail Haniyeh[7], the former chairman of Hamas's Politburo from 2017 until his reported death on or about July 31, 2024. In the message, in substance and in part, CC-3 stated that

---

[4] On or about March 27, 2024, OFAC designated CC-1 and Gaza Now as SDGTs pursuant to Executive Order 13224 for being key financial facilitators involved in fundraising for Hamas.

[5] On or about March 27, 2024, the same day OFAC designated CC-1 and Gaza Now, OFAC also designated CC-2 and the Al-Qureshi Executives as SDGTs pursuant to Executive Order 13224 for being key financial facilitators involved in fundraising for Hamas.

[6] On or about October 7, 1997, the Secretary of State designated PIJ an FTO. On or about October 31, 2001, the Department of State designated PIJ as an SDGT pursuant to Executive Order 13224.

[7] On or about January 31, 2018, the Department of State designated Haniyeh as an SDGT pursuant to Executive Order 13224.

he is an employee of Hamas's political wing, the Change and Reform Bloc. CC-3 explained that Abu Al-Abed knew that CC-3 was wounded when CC-3 had arrived in Turkey two days ago and that CC-3 has not received his salary since the events in Gaza. CC-3 ended the message by explaining that he needed help from Abu Al-Abed—*i.e.* Haniyeh—and that he would like to meet him, if he is available. CC-1 then forwarded the audio message to another contact.

20. On or about December 4, 2023, following an Israeli strike that injured members of CC-1 and CC-3's family on or about November 22, 2023, Haniyeh publicly offered his condolences on the martyrdom of CC-1's family in a public statement. CC-3 referenced the strike in the audio message he sent to CC-1, which was addressed to Haniyeh. *See supra* ¶ 19.

**SABASSI'S RELATIONSHIP WITH CC-1 AND GAZA NOW**

21. REDA MAZEN RIDA SABASSI, the defendant, has communicated with CC-1 since at least in or about October 2017 and, for years, SABASSI has worked with CC-1 and Gaza Now to distribute propaganda and raise funds for Hamas. In audio and text messages from phones seized from SABASSI and CC-1, SABASSI and CC-1 have often discussed how to transfer money to Gaza without being detected by authorities or having their accounts frozen. Additionally, they discussed various methods and applications for sending money that made it more difficult for law enforcement to trace or identify the parties involved. SABASSI and CC-1 also tried to avoid law enforcement scrutiny by using wallets that were not publicized on social media to transact with others or recipients CC-1 referred to as the "brothers"—*i.e.*, members of Hamas. Moreover, CC-2 advised CC-1 (who then communicated CC-2's advice to SABASSI) to not include Hamas in transaction descriptions to avoid transactions being denied or blocked or accounts being closed.

22. In addition, in audio and text messages from phones seized from REDA MAZEN RIDA SABASSI, the defendant, and CC-1, SABASSI also asked CC-1 about details of the October 7 Hamas Massacres. Specifically, on or about November 5, 2023, SABASSI asked CC-1 where he could find video archives for the October 7 Hamas Massacres belonging to Hamas. CC-1 directed SABASSI to the al-Qassam Brigades Telegram channel. A few days later, on or about November 8, 2023, SABASSI asked CC-1 why it was reported that the "operation"—*i.e.*, the October 7 Hamas Massacres—started on October 7 but the first pictures and videos were dated October 6. CC-1 explained that the attack started before October 7 but that the strongest hit of the attack was on October 7.

**SABASSI'S FUNDRAISING FOR HAMAS WITH CC-1 AND GAZA NOW**

23. Between in or about December 2023 and in or about February 2024, REDA MAZEN RIDA SABASSI, the defendant, organized four online fundraising campaigns in conjunction with CC-1, which were also advertised by Gaza Now:

a. On or about December 23, 2023, SABASSI created a fundraiser titled: "Help 4 orphans who were rescued from Gaza start a new life" ("Fundraiser-1"). Fundraiser-1 sought to raise $100,000 purportedly for four orphans who lost their parents and home in Israeli airstrikes on or about November 22, 2023. Fundraiser-1 described these orphans as the last surviving members of CC-1's family. As explained above, Hamas pays family members of Hamas operatives who are killed—*i.e.*, martyrs, *see supra* ¶ 10—and Haniyeh (a Hamas leader) offered his condolences on the martyrdom of CC-1's family following the Israeli airstrikes, *see supra* ¶ 20.

b. On or about January 20, 2024, SABASSI created a fundraiser titled "Gaza Relief" with a donation goal of $1 million ("Fundraiser-2"). The subtitle for the campaign

stated that it aimed to provide vital necessities, food, tents, and clothes for those in need. CC-1 subsequently directed SABASSI to use a certain image and title for Fundraiser-2.

c. On or about February 1, 2024, CC-1 messaged SABASSI about a new fundraising campaign and asked about the campaign being in the name of Gaza Now with photographs and videos so that people would know it is an official campaign. SABASSI replied that the campaign would be for Gaza Now but would not be in Gaza Now's name and messaged CC-1 that the name should be "Izz Al-Din Al-Qassam, for 😂 example"—referring to Hamas's al-Qassam Brigades. In response, CC-1 said: "Lol. Oh dear. Into prison."—referring to the fact that they would be imprisoned if they overtly publicized that the funds were being raised for Hamas. SABASSI and CC-1 then agreed to use "Ikram," the name of SABASSI's entity.

d. The next day, on or about February 2, 2024, SABASSI started another fundraiser titled "Gaza Relief Urgent Appeal" with a donation goal of $1 million ("Fundraiser-3"). The subtitle for Fundraiser-3 stated that it aimed to provide vital necessities, like medicine, food, tents, and clothes. That same day, SABASSI sent the link for Fundraiser-3 to CC-1 and reported: "So far US$12,959 out of $54,806 for the displaced."

e. On or about February 21, 2024, SABASSI created another fundraiser title "Gaza Relief Funds" with a donation goal of $500,000 ("Fundraiser-4") (together with Fundraiser-1, Fundraiser-2, and Fundraiser-3, the "Fundraisers"). The subtitle for Fundraiser-4 stated that it aimed to provide necessities, food, tents, and clothes for those in need.

f. SABASSI deactivated the Fundraisers in or about March 2024.

**The Funds Raised by SABASSI and Ikram**

24. As described above, REDA MAZEN RIDA SABASSI, the defendant, raised at least approximately $604,000 through the Fundraisers. As set forth in more detail below, of those funds, SABASSI (i) sent approximately $10,000 to a company at the direction of CC-1 to be transferred to Turkey; (ii) attempted to convert about $382,000 to cryptocurrency for the purpose of sending at least a portion of those funds to a wallet provided by CC-1, but which were retained or not returned by SABASSI's cryptocurrency exchangers; (iii) sent approximately $116,000 to CC-3, who as stated above, is a member of Hamas, *see supra* ¶ 19; and (iv) used some of the remaining funds for his own personal expenses.

a. On or about January 29, 2024, SABASSI, at the direction of CC-1, wrote a check for $10,000 to a U.S.-based entity owned by another co-conspirator ("CC-4") who would arrange for those funds to be sent to Turkey.

b. Between on or about February and March 2024, SABASSI attempted to use the services of another individual ("Individual-1") to convert funds he received from his Fundraisers to USDT to be sent to a cryptocurrency address that CC-1 sent to SABASSI.[8] Over the course of multiple transactions between on or about February 7 and 23, 2024, SABASSI sent approximately $382,000 to a U.S.-based company and another individual at the direction of Individual-1. SABASSI never received any cryptocurrency from Individual-1 or his associates, however, and the funds SABASSI sent to Individual-1 and his associates were never returned to SABASSI.

---

[8] Tether ("USDT") is a stablecoin, or a fiat-collateralized token, that is backed by fiat currencies in order to stabilize their value by tying it to the value of fiat currency. Tether is tied to the value of the U.S. dollar.

c. SABASSI updated CC-1 about the funds raised through the Fundraisers. For example:

i. On or about February 10, 2024, SABASSI messaged CC-1 an accounting for the first $100,000 that SABASSI would be sending. Specifically, SABASSI wrote there would be $47,177.96 for the "Al Jama'ah campaign," $11,390 for the Ikram campaign, $13,500 for the displaced orphan campaign, and $27,932 for the orphan children campaign. "Al Jama'ah" translates to "the group," and appears to refer to Hamas because of, among other things, SABASSI and CC-1's prior discussions, CC-2's instructions not to include "Hamas" in transaction descriptions, CC-1's fundraising for PIJ with CC-2 and Al Qureshi Executives, SABASSI's other support for Hamas, and the fact that SABASSI had only created three fundraising campaigns as of the date of the text message that he sent CC-1. SABASSI's use of the "Ikram campaign" refers to Fundraiser-3, the "orphan campaign" refers to Fundraiser-1, and the "displaced orphan campaign" refers to Fundraiser-2.[9]

ii. On or about February 14, 2024, SABASSI messaged CC-1: "The upcoming disbursement amounts to approximately 294,000, allocated as follows: Al-Jama'ah Campaign – 189,601.47 // Ikram Campaign – 25,406.25 // Children's Campaign – 45,716.65 // Children's Campaign for Displaced Persons – 18,456." In this message, SABASSI advised CC-1 that he expected to send approximately $190,000—the majority of the fundraising raised by that date—specifically for Hamas, in addition to allocating the remaining portion to the other purported charitable campaigns for Hamas members and their families.

[9] Fundraiser-4 was not created until on or about February 20, 2024, after this message was sent.

d. Between on or about February 28 and March 13, 2024, SABASSI transferred a total of approximately $116,000 of the funds raised through the Fundraisers to an account registered in CC-3's name in Turkey.

e. In total, SABASSI raised at least approximately $511,000 for CC-1 and Gaza Now to transfer to Hamas, though he was only able to transfer approximately $126,000 to Gaza Now through CC-3 and CC-4 because Individual-1 and his associates retained and/or did not return approximately $382,000 raised by SABASSI and did not provide him the equivalent amount of USDT for transfer to Gaza Now.

25. REDA MAZEN RIDA SABASSI, the defendant, also diverted at least some of the funds he raised through the Fundraisers for personal use. SABASSI used approximately $24,000 raised through the Fundraisers for SABASSI's own rent, credit card payments, and to purchase personal cryptocurrency, among other personal uses.

**STATUTORY ALLEGATIONS**

26. From at least in or about 2022 up to and including in or about March 2024, in the Southern District of New York and elsewhere, REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b)(1), to a foreign terrorist organization, namely, Hamas, which was designated by the U.S. Secretary of State as a foreign terrorist organization on or about October 8, 1997, pursuant to Section 219 of the Immigration and Nationality Act, and is currently designated as such as of the date of the filing of this Indictment.

27. It was a part and an object of the conspiracy that REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, would and did knowingly provide

Hamas with material support and resources, including services, property, and personnel, knowing that Hamas was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hamas engages and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the Immigration and Nationality Act), and that Hamas engages and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(A), (d)(1)(D), (d)(1)(E), and (d)(1)(F).)

**COUNT TWO**
**(Conspiracy to Violate the International Emergency Economic Powers Act)**

The Grand Jury further charges:

28. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

**The International Emergency Economic Powers Act**

29. The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1710, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

**The Global Terrorism Sanctions Regulations**

30. On September 23, 2001, the President issued Executive Order 13224, providing that all property and interests in property in the United States of persons determined to have committed or to pose a significant risk of committing acts of terrorism that threaten U.S.

nationals or the national security, foreign policy, or economy of the United States, or determined to act for or on behalf of such persons or to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or such persons (Specially Designated Global Terrorists or SDGTs) is blocked. Executive Order 13224 authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Order. Pursuant to this authority, the Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations ("GTSR"), implementing the sanctions imposed by the Executive Order.

31. Title 31, Code of Federal Regulations, Section 594.201(a) of the GTSR provides, in relevant part:

> [P]roperty and interests in property of [SDGTs] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . .

without a license from United States Department of the Treasury, Office of Foreign Assets Control ("OFAC").

32. Section 594.204 of the GTSR further prohibits any U.S. person from engaging in any transaction or dealing in property or interests in property of persons whose property or interests in property are blocked pursuant to the GTSR. In particular, the GTSR specifically prohibits the making of any contribution or provision of funds to, by, or for the benefit of designated SDGTs.

33. Section 594.205 of the GTSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the GTSR.

34. On October 31, 2001, the Department of State designated Hamas as an SDGT pursuant to Executive Order 13224.

35. On October 31, 2001, the Department of State designated Palestinian Islamic Jihad as an SDGT pursuant to Executive Order 13224.

**Statutory Allegations**

36. From at least in or about 2022 up to and including in or about March 2024, in the Southern District of New York and elsewhere, REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under IEEPA, 50 U.S.C. §§ 1701-1710.

37. It was a part and an object of the conspiracy that REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, would and did cause U.S. persons to engage in transactions and dealings in property and interests in property of persons whose property and interests in property are blocked pursuant to the GTSR, including Hamas, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to transactions and dealings in property and interests in property of Hamas, in violation of Executive Order 13224 and Title 31, Code of Federal Regulations, Sections 594.201, 594.204, and 594.205.

(Title 50, United States Code, Section 1705; Executive Order 13224; Title 31, Code of Federal Regulations, Sections 594.201, 594.204, and 594.205.)

**COUNT THREE**
**(Conspiracy to Commit Wire Fraud)**

The Grand Jury further charges:

38. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

39. From at least in or about 2022 up to and including in or about March 2024, in the Southern District of New York and elsewhere, REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

40. It was a part and an object of the conspiracy that REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, having devised and intending to devise a scheme or artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349)

**COUNT FOUR**
**(Conspiracy to Commit Money Laundering)**

The Grand Jury further charges:

41. The allegations contained in paragraphs 1 through 25 of this Indictment are repeated and realleged as if fully set forth herein.

42. From at least in or about 2022 up to and including in or about March 2024, in the Southern District of New York and elsewhere, REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, intentionally and knowingly combined, conspired,

confederated and agreed together and with each other to commit money laundering, in violation of Title 18, United Stats Code, Section 1956(a)(2)(A).

43. It was a part and object of the conspiracy that REDA MAZEN RIDA SABASSI, the defendant, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, and to places outside the United States from and through places in the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, the conspiracy to provide material support to Hamas and to violate IEEPA as charged in Counts One and Two of this Indictment, and (b) wire fraud, in violation of Title 18, United States Code, Section 1343, which are in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 1956(f))

**FORFEITURE ALLEGATIONS**

44. As a result of committing the terrorism offense alleged in Count One of this Indictment, REDA MAZEN RIDA SABASSI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of said offense; any and all assets, foreign and domestic, of the defendant; any and all assets, foreign and domestic, affording the defendant a source of influence over any entity or organization engaged in planning or perpetrating said offense; any and all assets, foreign and domestic, acquired or maintained with the intent and for the purpose of supporting, planning, conducting or concealing said offense; any and all assets, foreign and domestic, derived from, involved in, or used or intended to be used to commit said offense, including but not limited to a sum of money in United States currency representing the total amount of proceeds traceable to the commission of the offense and/or the defendant's assets

45. As a result of committing the IEEPA and wire fraud offenses alleged in Counts Two and Three of this Indictment, REDA MAZEN RIDA SABASSI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Codem Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts Two and Three of this Indictment, including but not limiting to a sum of money representing the amount of process obtained as a result of the offenses.

46. As a result of committing the money laundering offense alleged in Count Four of this Indictment, REDA MAZEN RIDA SABASSI, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

**Substitute Assets Provision**

47. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a) cannot be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third person;

c) has been placed beyond the jurisdiction of the court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

[redacted]

Jay Clayton
JAY CLAYTON
United States Attorney